AO 106 (Rev. 06/09) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of Missouri

In the Matter of the Search of

The Premises Located at: 86 Landon Road, Bourbon, MO 65441 (Crawford County, MO Parcel Number: 026024000050000). The premises is further described in Attachment A.

)
)
)
)
)
)

Case No.  4:21 MJ 331 DDN

Signed and Submitted to the Court for Filing by Reliable Electronic Means

## APPLICATION FOR A SEARCH WARRANT

I, KENNETH L. JAMISON                    , a federal law enforcement officer or an attorney for the government request a search warrant and state under penalty of perjury that I have reason to believe that on the following property:

See Attachment A.

located in the _____ EASTERN _____ District of _____ MISSOURI _____ , there is now concealed

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 42 U.S.C. Section 7413 and 18 U.S.C. Section 371 | Clean Air Act and Conspiracy to defraud the United States |

The application is based on these facts:

SEE ATTACHED AFFIDAVIT WHICH IS INCORPORATED HEREIN BY REFERENCE

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Special Agent Kenneth L. Jamison, U.S. Environmental Protection Agency, Criminal Investigation Division (EPA-CID)

*Printed name and title*

Sworn to, attested to, and affirmed before me via reliable electronic means pursuant to Federal Rules of Criminal Procedures 4.1 and 41.

Date:  **December 14, 2021**

City and state:  St. Louis, MO

/s/  David D. Noce

*Judge's signature*

Honorable David D. Noce, U.S. Magistrate Judge

*Printed name and title*

AUSA:  GWENDOLYN CARROLL

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI

IN THE MATTER OF THE SEARCH OF        )
THE PREMISES LOCATED AT: **86**            )        No. 4: 21 MJ 331 DDN
**Landon Road, Bourbon, MO 65441**        )
**(Crawford County, MO Parcel Number:**  )
**026024000050000)**                              )        FILED UNDER SEAL

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, **Kenneth L. Jamison**, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises known as **86 Landon Road, Bourbon, MO 65441 (Crawford County, MO Parcel Number: 026024000050000)** (the "subject premises") further described in Attachment A, for the things described in Attachment B.

2.      I am a Special Agent with the United States Environmental Protection Agency, Criminal Investigation Division ("EPA-CID"), assigned to the St. Louis Resident Office. I have been a Special Agent with EPA-CID for over 19 years and have conducted and assisted with numerous investigations of alleged violations of federal law including the Clean Air Act. I am authorized by the Administrator of EPA to exercise all authority and perform all duties established by the laws of the United States and the regulations of EPA. As part of my duties as special agent with EPA-CID since 2002, I have been responsible for conducting criminal investigations, including the execution of search warrants, in connection with alleged violations of federal environmental statutes. I have also received training and participated in numerous investigations involving alleged violations of both Title 42 and Title 18 of the United States Code.

3.     The statements contained in this affidavit are based upon my conversations with colleagues and individuals, conducting surveillance and undercover operations, and through reviewing internet records and documents associated with this investigation.  Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have only set forth facts believed are necessary to establish probable cause that particular items which are evidence of alleged violations of Title 42, United States Code, § 7413 and 18 U.S.C. § 371 are located at the subject premises.

## LOCATION TO BE SEARCHED

4.     The location to be searched is:

**86 Landon Road, Bourbon, MO 65441 (Crawford County, MO Parcel Number: 026024000050000)**.  The subject premises is described in Attachment A.

## BACKGROUND REGARDING THE CLEAN AIR ACT

I.     **CLEAN AIR ACT ("CAA")**

5.     The purpose of the Clean Air Act is, among other things, "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population."  42 U.S.C. § 7401(b)(1); see also 42 U.S.C. § 7470.  In enacting the CAA, Congress found that "the increasing use of motor vehicles . . . has resulted in mounting dangers to the public health and welfare."  42 U.S.C. § 7401(a)(2).

6.     The CAA regulates "mobile sources," which include motor vehicle engines and off-road vehicles and engines.  Mobile sources must comply with the CAA emission standards.  Those standards apply to cars, trucks, buses, recreational vehicles and engines, generators, farm and construction machines, lawn and garden equipment, marine engines, and locomotives.

2

7.      Congress has instructed the EPA to establish regulations and standards to control emissions from motor vehicles which cause or contribute to air pollution which may reasonably be anticipated to endanger public health or welfare. 42 U.S.C. § 7521(a)(1).

8.      Congress authorized the EPA to enforce the emission standards and regulations applicable to mobile sources to ensure that pollutant levels are controlled and reduced.  42 U.S.C. § 7524.

9.      Pursuant to 42 U.S.C. §§ 7521-7554, and the regulations promulgated thereunder, the EPA has established standards limiting the emission of air pollutants from various classes of motor vehicle engines.

10.     Heavy-duty diesel engines ("HDDEs") are one such category, and are subject to the regulations found at 40 C.F.R. Part 86, Subpart A.  Light-duty vehicles and medium-duty vehicles are subject to the regulations found at 40 C.F.R. Part 86, Subpart S.  As required by the CAA, the emission standards must "reflect the greatest degree of emission reduction achievable through the application of [available] technology."  42 U.S.C. § 7521(a)(3)(A)(i).  Accordingly, the EPA has established emission standards for vehicles.  40 C.F.R. §§ 86.004-11, 86.007-11, 86.096-11, 86.098-11, 86.009-11 (HDDE); 40 C.F.R. §§ 86.1811-04, 86.1811-09, 86.1811-10, 86.1811-17 (light-duty/medium-duty vehicles).

11.     To meet these emission standards, engine manufacturers employ many devices and "elements of design."  "Elements of design" means "any control system (*i.e.*, computer software, electronic control system, emission control system, computer logic), and/or control system calibrations, and/or the results of systems interaction, and/or hardware items on a motor vehicle or motor vehicle engine."  40 C.F.R. § 86.094-2.  Manufacturers also employ certain hardware

3

devices as emission control systems to manage and treat engine exhaust to reduce the levels of pollutants that are being emitted into the air.  Such devices include diesel particulate filters ("DPF"), exhaust gas recirculation ("EGR"), diesel oxidation catalyst ("DOC"), and selective catalytic reduction ("SCR").

12.     Under 42 U.S.C. § 7521(m)(1), the EPA is authorized to create regulations requiring manufacturers to install on-board diagnostic ("OBD") systems on vehicles and engines to ensure the vehicles' emission control systems are functioning properly.  The EPA has thus enacted regulations that require manufacturers to install OBD systems on both light-duty and heavy-duty vehicles and engines.  OBD systems must be "capable of monitoring all emission-related engine systems or components," including the DPF, EGR, DOC, and SCR. See 40 C.F.R. §§ 86.010-18 and 86.1806-05.

13.     The CAA provides criminal penalties for tampering with monitoring devices or methods.  Pursuant to 42 U.S.C. § 7413(c)(2)(C), any person who knowingly falsifies, tampers with, renders inaccurate, or fails to install any monitoring device or method required to be maintained or followed under the CAA shall, upon conviction, be subject to a fine and up to two years of imprisonment.

14.     OBD systems are monitoring devices or methods required to be maintained or followed under the CAA to ensure that the emission control systems are functioning properly.  *See* 40 C.F.R. §§ 86.010-18(a) (requiring OBD system for certain heavy-duty vehicles "capable of monitoring all emission-related engine systems or components during the life of the engine") and § 86.1806-5(a)(1) (requiring OBD system for certain light-duty vehicles "capable of monitoring all emission-related powertrain systems or components during the applicable useful life of the

4

vehicle").   Accordingly, tampering with or rending inaccurate an OBD system is a criminal violation of the CAA

15.    Also applicable to the EPA's enforcement of emissions regulations is 18 U.S.C. § 371, which states that if two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons does any act to affect the object of the conspiracy, each shall be subject to a fine and/or up to five years of imprisonment.

## II.        DIESEL EMISSION/EXHAUST SYSTEM COMPONENTS

16.    Diesel-powered trucks have additional emission system components compared to gasoline-powered trucks.   Several of the components, described below, are affixed to the undercarriage of diesel trucks.  These components work in concert and are intended to reduce the pollutant emissions produced by diesel-powered engines.  Since model year 2013, all diesel trucks, no matter their weight, have been required to be equipped with an OBD, which monitors all emission-related engine systems and components, including the DOC, DPF, EGR and SCR.  If there is a malfunction or deterioration of the emission system, the OBD will cause a Malfunction Indicator/Check Engine Light to be illuminated in the truck's cabin. The diagram below shows the general layout of some of these components:



17.     In certain circumstances, if a hardware emission system problem is not resolved, the OBD can shut down the truck or limit the top speed of the truck, an effect commonly referred to as "limp mode" or "power reduced mode."  In some instances, operating in limp mode will limit a truck's horsepower (potentially resulting in a maximum speed as low as five miles per hour). This is intended to provide an incentive for the truck's operator to repair the truck.  Effectively, the hardware components (DOC, DPF, EGR and SCR) and computer component (OBD) work together to reduce emissions and monitor diesel truck emission hardware components.

18.     A DOC is one component of the hardware emission system.  The DOC converts hydrocarbons (fuel) and carbon monoxide (exhaust) into water and carbon dioxide though an oxidation reaction.  The DOC is akin to a gasoline engine's catalytic converter.  The function of both a DOC and a catalytic converter is to reduce pollutants released into the atmosphere.

19.     A second component is the SCR system.  The SCR is a type of catalytic converter that uses Diesel Exhaust Fluid, which contains a urea-based fluid that is injected into the exhaust gases.  When the urea and NOx (nitrogen oxides) containing gases reach the SCR catalyst, they react to form nitrogen and water.

20.      A DPF is a third component.  Once the exhaust stream has been treated by the DOC and SCR, it travels through the DPF where particulate matter is trapped and stored, further reducing the pollutants released into the atmosphere.

21.      A fourth component is the EGR system.  This system provides a nitrogen oxide (NOx) emission reduction technique by recirculating a portion of the engine's exhaust gas back to the engine cylinders.  This process dilutes the oxygen in the incoming air stream and provides gases inert to combustion to act as absorbents of combustion heat to reduce peak in-cylinder temperatures.  This reduces combustion temperatures and thereby reduces formation of NOx.

### III.      DEFEAT DEVICES AND METHODS

22.      There are various methods to defeat the emission system on a vehicle.  One method used to defeat the emission system is to completely remove the portion of the exhaust system that contains the emission control devices and replace it with a section of exhaust tubing or an aftermarket "straight pipe."  Under this method the emission components are no longer installed to limit pollutant gases and particulate matter from being emitted to the atmosphere.

23.      Another method used to defeat the required emission system on a vehicle is to remove components such as the DOC and DPF, hollow them out by removing internal contents, and then reconnect them to the exhaust pipe.  This procedure gives the appearance that the emissions components are still intact but eliminates their effective function.

24.      Another method used to defeat the emission system is to disconnect or remove the SCR.  The SCR consumes diesel exhaust fluid at a rate of 1% to 2% of fuel consumption.  As diesel exhaust fluid is priced similarly to diesel fuel, disabling the SCR avoids the expense of refilling the diesel exhaust fluid.

25.     Yet another method used to defeat the emission system is to disable the EGR. The EGR can be turned preoff electronically or can be physically removed.  Examples of EGR delete hardware include EGR block plates, which are used to cover the ports on the exhaust manifold or other exhaust or intake components where the EGR would otherwise be used to redirect exhaust gas back to the intake; a replacement manifold that would not include an EGR port; and EGR cooler replacements that are welded shut.  Disabling the EGR can increase engine power but at the expense of greater formation of NOx.

26.     If any of the emissions hardware components (DOC, DPF, SCR, or EGR) are removed or disabled as described above, a properly functioning OBD will detect a malfunction. Thus, a defeat device must be used to manipulate the OBD to prevent the truck from going into "limp mode" and to prevent the Malfunction Indicator Light from turning on.  The practice of using a defeat device to manipulate an OBD system in this manner is commonly referred to as "tuning" the vehicle.

27.     Although it is possible for an individual to legitimately "tune" in a manner that does not impair emission controls or the OBD, using other methods, this Affidavit focuses on those circumstances in which tuning manipulates a vehicle's OBD system in such a way as to prevent the OBD from detecting the removal or disabling of the emission hardware components.  When a vehicle is "tuned" in this way, it may be able to run with increased horsepower and torque, and a vehicle's fuel mileage may also increase.  However, tuning vehicles in this manner results in significantly increased pollutant emissions.  The process of tuning uses a software program often referred to as a "tune," in which a tune is a software program used by a tuner to affect engine operations, often including emissions controls and monitoring devices.

8

28.     The EPA is aware of multiple types of defeat devices used for tuning.  One example is a plug-in tuner, which is a defeat device that can be plugged into the vehicle's data link connector to the OBD and permit "on-the-fly" tuning.  Plug-in tuners allow the driver to turn on and off at will the software modifications that manipulate the engine computer module and prevent the OBD from detecting a malfunction in the emission controls.

29.     Another example is a defeat device that involves "flashing" (reprogramming) the engine computer module. This defeat device prevents the OBD from detecting a malfunction in the emission controls.  In preventing the OBD from detecting these malfunctions, these defeat devices are tampering with or rendering inaccurate a monitoring device or method required under the CAA.

## PROBABLE CAUSE

### WHISKEY DIX BIG TRUCK REPAIR AND SQUARE ONE TRANSPORT

30.     On November 29, 2019, the EPA received information from the Federal Bureau of Investigation concerning allegations the Federal Bureau of Investigation had received concerning a trucking business in Bourbon, MO which had "deleted" their fleet of semi-trucks. I know that the term "delete," as used in the diesel truck industry, refers to the removal of emissions control equipment including the diesel particulate filter or DPF, EGR or exhaust gas recirculation, and other parts, as mentioned above.  The names of the businesses included Square One Transport and Whiskey Dix Big Truck Repair.

31.     In September of 2021, a Federal Grand Jury returned an Indictment (4:21-CR-532 SEP/SRW, Doc. No. 2) against two individuals, Christopher Lee Carroll ("Carroll") and George Reed ("Reed"), including three counts of bank fraud and six counts of money laundering related

to a scheme from in or about March 2020 through in or about March 2021 in which they are alleged to have knowingly defrauded Enterprise Bank and Trust to obtain moneys, funds, assets, and other property by means of materially false and fraudulent pretenses, representations, and promises, to wit, false and fraudulent representations to obtain 2.8 million dollars in PPP (also known as the Paycheck Protection Program) loans.  The PPP program was enacted in March of 2020 to provide emergency financial assistance to the millions of Americans suffering the economic impact caused by the COVID-19 pandemic.

32.     Again according to the aforementioned Indictment, Carroll and Reed, beginning on May 15, 2020 and continuing through June 2020, spent 1.9 million dollars to acquire trucks, trailers, and land to start three new businesses including Whiskey Dix Big Truck Repair, Square One Logistics, and Square One Transport.  Whiskey Dix Big Truck Repair was listed as a truck repair business located in Bourbon, MO.  Square One Transport was listed as a trucking company that provided freight transport services.  Square One Logistics was listed as a holding company that owned assets including land and trucks, that were acquired by Carroll and Reed to start Whiskey Dix Big Truck Repair and Square One Transport.

33.     The Indictment also identified in its Forfeiture Allegation twenty-nine trucks and trailers purchased by Carroll and Reed. These included ten semi-trucks (also known as Tractor Trucks) manufactured in the years 2013-2016.

34.     Your affiant conducted research on the businesses Whiskey Dix Big Truck Repair, Square One Transport, LLC, Square One Logistics, LLC and others.  According to the Missouri Secretary of State, www.sos.mo.gov, Whiskey Dix Big Truck Repair was formed on May 26, 2020, was listed as a fictitious name for Square One Logistics, LLC and had the business address

of 380 Landon Road, Bourbon, MO 65441.  Whiskey Dix Trucking was formed on May 26, 2020, was listed as a fictitious name for Square One Logistics, LLC and had the business address of 380 Landon Road, Bourbon, MO 65441.  Whiskey Dix Big Truck Repair, LLC was formed on June 18, 2020, was listed as an active business, and the address was for CT Corporation, the registered agent, 120 South Central Avenue, Clayton, MO 63105.  Square One Transport, LLC also had the same date or June 18, 2020, same registered agent, and same address as above.

35.    On December 7, 2021, I learned of a complaint received by the U.S. EPA dated February 19, 2021 relating to Whiskey Dix Big Truck Repair and Square One Transport.  The text of the complaint is listed below:


    2/19/2021 12:36 PM
    HQ LEAD NUMBER: FY21-218795-3714
    SUBJECT: Criminal Tip and/or Complaint - Missouri
    FROM: scrftruck@gmail.com
    Name: Brandon Sinclair
    Phone: 6182233232
    Alleged Violator's Name: Whisky Dix & Square One Transport
    Alleged Violator's Address: 380 Landon Rd
    Alleged Violator's City:  Bourbon
    Alleged Violator's State:  Missouri
    Alleged Violator's Zip:  65441
    Tip or Complaint:  They Delete all diesel truck emissions on their fleet or OTR semi-trucks.
    They have about 70 of them deleted and doing more in-house daily.
    Violation Still Occurring? Yes
    State DEP/DEQ/DEM Notified? No

36.    On December 7, 2021, I spoke by telephone with Jed Wolkins ("Wolkins") of the U.S. EPA Region 7, Regional Haze and Mobile Lead, Air and Radiation Division.  Wolkins was asked if he was familiar with Square One Transport, Square One Trucking, and/or Whiskey Dix Big Truck Repair.  Wolkins advised that he thought he recalled those names.  He explained that

for a time he was receiving all calls relating to diesel aftermarket defeat devices.  In a search of his emails, Wolkins found three emails relating to said names.  He provided these emails to me.  From those emails I learned that on July 23, 2021 – July 26, 2021, Wolkins received three calls from the same person, using the name "Allen," concerning "deletes." Specifically, in a July 29, 2021 email, "Allen" had provided Wolkins with a list of vehicles "Allen" knew to have been deleted at Whiskey Dix Big Truck Repair These included the following:

1001, 1003, 1005, 1007, 1008, 1009, 1010, 1012, 1013, 1015, 1016, 1017, 1019, 1023, 1028, 1030, 1032, 1035, 1037, 1038, 1044, 1048, 1050, 1055, 1057, 1059, 1061, 1062, 1063

### INTERVIEWS OF ALLEN FARRAR

37.    On November 30, 2021 and December 6, 2021, I telephonically interviewed Allen R. Farrar ("Farrar") who provided the information reflected in paragraphs 38-59.  I believe that Farrar is the "Allen" who had provided information to Wolkins, as the telephone number for Farrar matched the number for "Allen" included in Wolkins' records.

38.    Farrar worked for Square One Transport ("Square One") for about one year.  He began in September of 2020 and quit around May or June of 2021.  He currently is a union heavy equipment operator in St. Louis, MO.  Farrar relayed the following information to me:

39.    Carroll was the owner of the business.  According to Farrar, Carroll was the "Big Wig."

40.    Square One had about fifty semi-trucks.  The trucks are owned by the business and truck drivers are employed by Square One and paid for their mileage.  Each driver had his/her own fleet card.  All trucks were numbered.  The number was on the truck as a sticker and usually found

on the hood. Of this fleet, only one truck had not been deleted. Deleted meant the removal of emissions equipment, such as the diesel particulate filter, from the trucks. The sole truck that had not been deleted had the number 1029. Farrar advised that the reason 1029 had not been deleted was that the truck was old enough that it did not have a DPF system on it and did not use DEF or diesel emissions fluid.[1]

41.     Farrar believed that the trucks were deleted around July or August of 2019 when the company first got started. He based this conclusion on discussions he heard among company personnel in the shop.

42.     Farrar stated that if DEF was purchased by the drivers, it would have been on the company fleet card. Farrar did not think that drivers had to purchase DEF as the DPFs had been removed.

43.     The fleet of trucks owned by Square One were deleted at Whiskey Dix Big Truck Repair. Farrar described Whiskey Dix Big Truck Repair as the mechanic shop for Square One.

44.     Across the street from Whiskey Dix Big Truck Repair were the business offices of Square One. This office space was an old storage shed that had been restored to its current condition.

---

[1] Your affiant knows that Diesel Exhaust Fluid (DEF) is a non-hazardous solution, which is 32.5% urea and 67.5% de-ionized water. DEF is sprayed into the exhaust stream of diesel vehicles to break down dangerous NOx emissions into harmless nitrogen and water. This system is called Selective Catalytic Reduction and can be found on 2010 and later model year trucks and many diesel pickups and SUVs. DEF is not a fuel additive and never comes into contact with diesel. It is stored in a separate tank, typically with a blue filler cap.

45.     Farrar listed known Square One deleted trucks from his memory bearing the following numbers:

    1001, 1011, 1019, 1025, 1034, 1025, 1019, 1037, 1038.

46.     According to Farrar, many of the diesel trucks were new.  He recalled this fact because some of the trucks were International Pro Stars and this particular model did not come out until 2016, 2017 or 2018.

47.     Farrar indicated that one of the trucks, a brown-colored Kenworth, had the DPF removed at Whiskey Dix Big Truck Repair where it was cut in half, had a pipe installed in it, then it was welded back together.  According to Farrar, this step was taken to make it seem that the truck was "legit" and that the DPF had not been removed although no longer in use.

48.     Farrar stated that "delete kits" were purchased for Cummins (a diesel engine manufacturer) semi-trucks.  A Peterbuilt truck dealer in O'Fallon, MO sold delete kits through one of their service guys, "Mark."  Chip Forester ("Forester") was the company manager for Whiskey Dix Big Truck Repair and Square One.  Forester would only deal with Mark for these kits.  Farrar opined that this seemed funny to him.  Forester took Mark and his wife on trips to the Lake of the Ozarks.  Farrar opined that these trips were paid on the company credit card for Square One and that Carroll knew all about it.

49.     Farrar explained that he had personal knowledge of the aforementioned trucks because he was a "janitor."  Farrar further explained that he and others considered himself a janitor because he took care of all tasks for Carroll.  If a truck went down, he went to go get it and provided a replacement truck.  He also went to pick up trucks and trailers if purchased by Carroll.

14

50.     Farrar stated that he was familiar with diesel trucks needing software when emissions equipment was removed so that trucks would not enter limp mode, etc.  According to Farrar, Carroll purchased said software for their trucks from a guy in the State of Texas. Dustin Pulliam was the computer guy at Whiskey Dix Big Truck Repair.  One laptop containing the software was used to download the software to the computers of the trucks.  This laptop was typically on or in a tool-chest at Whiskey Dix Big Truck Repair.  Farrar claimed that he saw it being used on deleted trucks stating that he saw "so many of them."  He knew the trucks were deleted as they had blocker plates and intake manifolds had been changed out.

51.     Farrar stated that freight and transport loads were not scheduled to or from the State of California. This was because it was known that the State of California Department of Transportation checked/inspected for deleted trucks there.  In addition, if a truck broke down on the road, they could not be taken to any "legitimate shop" because of the deleted condition of the trucks.

52.     Farrar advised that about two to three months prior to his departure from Whiskey Dix Big Truck Repair, there were quite a few DPFs inside the bay at the business.  These were DPFs that had been removed from their fleet of trucks.  Carroll wanted Farrar to take these DPFs to a recycler at Fenton Valley Park.  Carroll was under the impression that the DPFs could be valuable like catalytic converters.  One day, Farrar backed his truck into the building at Whiskey Dix Big Truck Repair, and he along with two other men from the business, "Frank" (who worked in Parts) and Aaron McEuen (who worked as a mechanic helper) loaded approximately 15 of the DPFs into Farrar's truck.  Before driving up to Fenton Valley Park, Farrar called around to see if the DPFs had any value.  He spoke with a man named Mark at a recycler in Potosi, MO, and also

15

with representatives from the companies Ace and Diddion Recycling.  The Ace employee with whom Farrar spoke said that they would have to look at the DPFs before they could estimate any valuation, and the other companies stated that the DPFs did not have any value.  As a result, Farrar drove around with the DPFs in his truck for about four or five days and ultimately, unloaded them back at Whiskey Dix Big Truck Repair.  Farrar unloaded them on a paved area up against the west side of the building next to the two air conditioning units for the building.  Farrar informed Carroll that it was a waste of time to try to recycle them.  These removed DPFs were still on-site in the same spot at Whiskey Dix Big Truck Repair when Farrar quit in May or June of 2021.  He estimated there to be 25 to 30 removed DPFs on-site.

53.     Farrar recalled that in 2020, Carroll purchased 15 trucks and 19 trailers from an auction in Sioux City, Nebraska.  The cost of these vehicles was about 1.7 million dollars.

54.     Farrar heard Carroll, Forester and others discussing deleted trucks.  He recalled them discussing that the EPA investigating deleted trucks was a myth and that they (EPA) "didn't care about that anymore."

55.     Farrar noted that some trucking company employees park the trucks at Whiskey Dix Big Truck Repair and some employees take them home.  Farrar indicated that all day Thursdays and Fridays are typically the best days to see trucks parked at the business as drivers prepare for Sunday departures.

56.     Farrar provided information on the businesses at Whiskey Dix Big Truck Repair and Square One Transport offices including the placement of offices, computers and other information.

57.     Carroll utilized his cellphone to make calls to drivers and others.  Farrar stated that Carroll only used this phone and could not recall a call he received from Carroll on a landline.

58.     Computers were utilized at the businesses of Whiskey Dix Big Truck Repair and Square One.  Forester had an office at Whiskey Dix Big Truck Repair which was upstairs. The dispatchers at Square One utilized computers to speak to drivers, schedule transports, etc. Carroll had an office at Square One along with others.

59.     Farrar was not familiar with much work performed on other fleets aside from Square One.  He stated that Whiskey Dix Big Truck Repair was the mechanic shop for Square One. When asked why the company would pay for a large advertising sign on Highway 44, Farrar stated that he did not know.  He stated that his whole time working, he did not know of any trucks, other than those belonging to Square One, being deleted at Whiskey Dix Big Truck Repair.

### INTERVIEW OF JASON HARMON

60.     On December 8, 2021, I interviewed Jason Harmon ("Harmon") by telephone.  I learned the following information, described in paragraphs 61-71.

61.     Harmon is the owner of Harmon Truck Service, 1411 South Service Road West, Sullivan, MO 63080.

62.      Harmon was familiar with the term "delete" as referring to the removal of emissions control devices on diesel trucks.  He advised that his mechanics hate it when trucks are brought into the shop that have been deleted.  He noted the difficulty of working on such vehicles and their inability to properly diagnose them.  The right thing to do is to put the vehicles back to their proper condition but guys don't want to do that as they had already spent thousands of dollars

to have it removed. The deletions cause the engines to run hotter, messes up fuel mapping, and can burn up turbos. New engines are a minimum of twenty thousand dollars.

63.     Harmon has lost employees to a new business in Bourbon, MO called Whiskey Dix Big Truck Repair.  He noted that the company was offering mechanics rates that not even big companies like Peterbuilt could offer.  Specifically, mechanics were being offered 40 dollars per hour with a $10,000 signing bonus.  As a comparison, Harmon's top mechanic is paid 30 dollars per hour and the highest paid person at Peterbuilt might make 32 dollars per hour.

64.     He opined that there is just a lot of money "flying around" from the businesses of Square One/Whiskey Dix Big Truck Repair.

65.     Harmon noted that George Reed ("Reed") of Square One/Whiskey Dix Big Truck Repair had tried to buy his shop prior to opening their own shop.  Insofar, Reed was asking Harmon for a lot of personal information and private business records.  This gave Harmon a very bad feeling about Reed. When he refused to provide the requested information, Reed later said they were not interested in purchasing the business.

66.     One of Harmon's employees who went to work for Whiskey Dix Big Truck Repair was Matt Willette ("Willette").  Harmon had purchased his business location from Willette's father in 2015.  At a birthday party, in August or September of 2021, attended by both Harmon and Willette, the two were talking about Square One/Whiskey Dix Big Truck Repair.  At this time, Willette informed Harmon that they delete all the trucks at Whiskey Dix Big Truck Repair. Harmon noted that Square One and Whiskey Dix Big Truck Repair are operated by the same people, and that those people operate under up to five to six business names, including the two aforementioned businesses.  Willette further explained that in order to perform the deletes, the

18

business had a guy out of Indiana who was able to flash the computers to make it all work.  Willette did not mention why the trucks were deleted, but said they did not want "the emissions stuff" on any of the trucks.  New trucks to the business were taken into Whiskey Dix Big Truck Repair before they were put into service where they "get it all wacked out of there," referring to the emissions control devices.

67.     Harmon stated that deletions on semi-trucks are "definitely done at the shop," referring to Whiskey Dix Big Truck Repair.  Harmon advised "one hundred percent" he had been told that Whiskey Dix Big Truck Repair was deleting trucks for other fleets.  He did not recall who he had learned this from.

68.     Because of the business he is in, Harmon orders parts from Peterbuilt in St. Peters, MO.  He thought the name of the person he dealt with there was named Jack (last name unknown).  Jack and Harmon discussed Square One and Whiskey Dix Big Truck Repair a few weeks ago.  The two both thought that "something dirty" was going on as this huge business just popped up out of nowhere.  He opined that this does not just happen.  Jack informed Harmon that the company had "deleted every single truck they have."  Harmon did not know how Jack knew this.  This discussion happened after parts ordered by Harmon were delivered to Whiskey Dix Big Truck Repair instead of to Harmon's business.  As a result, Jack informed Harmon that he could go get them as they were really close to Harmon's business.  In response, Harmon told Jack that he would not go to Whiskey Dix Big Truck Repair to pick up those parts because he would not send his employees over to a business he saw as being dirty.  In response, Jack "bit [Harmon's] head off about it" and then Harmon later called back Jack indicating that something was going on at Whiskey Dix Big Truck Repair.  It was then that Jack said he knew that they were not who they said they were and

19

that he had spoken to their (Peterbuilt's) lawyers about them as they were trying to be a Peterbuilt parts dealer and were not approved to be.  Jack indicated that Square One/Whiskey Dix Big Truck Repair went from zero purchases to Peterbuilt's number one customer.  Harmon opined, based on his past and current experience, that this high volume of business meant that Whiskey Dix Big Truck Repair was spending approximately $500,000 or more at Peterbuilt.

69.     Around September of 2021, the Service Manager at Whiskey Dix Big Truck Repair applied for a job at Harmon's business.  This person's name was Greg Hubbell ("Hubbell").  During a job interview, Hubbell informed Harmon that Whiskey Dix Big Truck Repair was going through and deleting every truck.  When I asked why Hubbell would tell Harmon this fact, Harmon opined that Hubbell was saying this as one of the reasons he did not want to be employed at Whiskey Dix Big Truck Repair any longer. In addition, Hubbell had been removed from his position and transferred to being a driver.  Harmon opined that Hubbell was "not happy."  Harmon did not hire Hubbell and he did not know whether Hubbell was still employed at Whiskey Dix Big Truck Repair/Square One.

70.     Harmon had heard that Whiskey Dix Big Truck Repair and the related companies had eighty or more trucks and that their goal was to have 200.

71.     Harmon advised that he wanted to share the aforementioned information after he had read about the owners being indicted for fraud in the PPP program.

**INTERVIEW OF BRANDON SINCLAIR**

72.     On December 9, 2021, I personally interviewed Brandon Sinclair ("Sinclair").  Sinclair provided the following information contained in paragraphs 73-98.

20

73.     Sinclair first met Carroll through the business Craven Performance. Carroll's moniker on-line was "Craven More Head."  This was a shop where people with money went to have their cars/trucks upgraded.  Carroll was really interested in drag racing and probably has about one million dollars tied up in it.  Carroll was a motorsports fanatic.  At the time he met Carroll, Sinclair had a fleet of about eighteen semi-trucks.  This was around 2016.  Carroll stated that he was interested in trucking and owning a trucking company.  Carroll went to work for Sinclair driving and helping him out to learn about the business.  After doing this for a while, Carroll stated that he had to go back into the business of selling tv shows to networks.  He claimed he made about $10,000 a week doing this.  After this, Sinclair and Carroll fell out of touch.

74.     Sinclair advised that Carroll was an incredible salesman with lots of charisma.

75.     During the heart of COVID, Carroll called Sinclair and said he was starting a trucking company and had already purchased about twenty semi-trucks.  Sinclair later learned that Carroll had purchased 5F Trucking.  Carroll wanted Sinclair to come work for him and help him get the business up and running.  Sinclair opined that Carroll knew nothing about the trucking business.

76.     Sinclair decided to work for Carroll and referred to himself as having been the Fleet Manager.  He was paid $2,500 per week.  He bought a tow truck, obtained a Department of Transportation registration number for the business, got the trucks insured, met with insurance representatives, and performed other tasks necessary to the operation of a trucking business.

77.     Sinclair indicated that most of the semi-trucks for the business were purchased from Taylor Martin.  Taylor Martin was a business similar to Richie Brothers, another trucking auctioneer company.  There was a lot in Peoria where Square One purchased trucks and also one

21

in the State of Nebraska.  Last year, Square One was Taylor Martin's largest customer.  When Sinclair exited the business (discussed later), Square One had sixty-four semi-trucks.

78.     Sinclair advised that being a new business in the trucking industry caused insurance policies to be very expensive.  He recalled that Square One had to advance pay about thirty-thousand dollars per semi-truck for a one million dollar policy on each.

79.     Carroll bought a piece of property on Landon road, later home to Whiskey Dix Big Truck Repair.  Carroll then bought land south of that location, which later became the parts store and finally, a piece of land across the street from Whiskey Dix Big Truck Repair, which became the offices for Square One/Whiskey Dix Big Truck Repair. Files for both companies were maintained at the Square One office location, as Whiskey Dix Big Truck Repair only had a "crows' nest" of an office, roughly the same size as Sinclair's truck.

80.     Square One was the business name that owned the semi-trucks.

81.     A woman named Tammy did the billing for both Whiskey Dix Big Truck Repair and Square One.  Her office was at the Square One office building.

82.     Sinclair quit working for Carroll around February of 2021.  Sinclair believed that Carroll might try to fight him or "cause a ruckus" if Sinclair informed Carroll of Sinclair's departure in person.  So instead, Sinclair drove over to the business at night, left his company credit card and keys, grabbed his laptop, and exited the business, throwing his keys back inside after locking up.  He stated that he made sure not to visit any other areas in the building.  Carroll saw Sinclair on his video cameras at the business and accused him of stealing from him.

83.     Sinclair had left for Mexico with his girlfriend and upon arriving at the Mexican airport received a call from the Crawford County Sheriff's office indicating that a report had come

in about him stealing about $10,000 worth of things from the business. Sinclair later, upon returning to the United States, met with the Crawford County Sheriff's Office, and showed them paperwork and provided information about his exit.  The police officers later informed him that they believed it to be a false police report.  According to Sinclair, Carroll, among other things accused him of stealing a website for booking trucker applications.  Sinclair explained that he purchased the website with his own credit card and set it up.

84.     Sinclair estimated that around April or May of 2020, trucks began to be deleted at Whiskey Dix Big Truck Repair.  These were vehicles belonging to Square One.

85.     Chip Forester ("Forester") did most of the deleting, assisted by Dillan (last name unknown).  Forester owned 5F Trucking, the business purchased by Carroll prior to it becoming Square One.  Forester had land adjacent to George Reed ("Reed") and knew him because of that connection.  Sinclair knew of about twenty semi-trucks that were deleted at Whiskey Dix Big Truck Repair.  When he left, there were four or five waiting to be deleted as well.  A few semi-trucks purchased were already deleted, but not many. If a truck broke down on the road and the issue was related to emissions equipment, the truck was brought back to Whiskey Dix Big Truck Repair and deleted, instead of fixing the issue on the road. The hauling of these trucks was mostly done by former employee Allen Farrar.

86.     Carroll knew it was illegal to delete the semi-trucks. To accomplish the deletes, DPFs would be removed and punched out, thereby removing the effective components, and then re-installed back on the trucks to give the appearance that the equipment was in place, although not effective.  Sinclair recalled that there was a ceramic interior of the DPFs that had to be hollowed

23

out.  This procedure was usually conducted in the compressor room, the only room at Whiskey Dix Big Truck Repair that was not under camera surveillance.

87.     To delete the EGRs, there were parts that were purchased on the internet. Sinclair noted that some of the parts necessary to accomplish the deletion were made at Whiskey Dix Big Truck Repair.   These pieces looked like a hockey puck and were used to block off the EGR. The EGR could also remain in place and appear legitimate.  Sinclair also noted that the SCRs were also disconnected.

88.     One of the mechanics, Will, did not want to do the deletes and complained about it.  Others also expressed concern about doing it.  Sinclair opined that Forester did not want to do it either.

89.     Sinclair did not think that deletes were immediately done to newly purchased trucks.  Instead, it was his belief that once the truck had an issue, they deleted it to save the costs of repairs, etc.

90.     Sinclair knew that software needed to be flashed onto the electronic control module ("ecm") of the semi-trucks. Otherwise, the trucks would 'throw a code.'  Sinclair recalled that Carroll had a friend, Travis Coleman, who had software he purchased from a man in the State of Texas that allowed him to delete diesel vehicles and re-flash the ecm.  Coleman came to Whiskey Dix Big Truck Repair and showed Carroll how his software worked on deleted trucks belonging to Square One.  By using the software, code could be copied and pasted onto the ecm and sensors for things belonging to the emissions turned off.  After seeing this, Carroll "was sold."  Carroll later purchased an IBM Touch Book containing this software from the man in Texas.  Sinclair refused to provide the name of the person who sold this software as he personally knew him but

24

stated that he is the biggest person in the Texas area selling performance equipment and that his company name started with the name 'Texas.'  Carroll also purchased other performance parts from this man.  Sinclair thought that Carroll paid this man eight thousand dollars for the laptop containing the software and then one thousand dollars for every truck he deleted and had to flash the ecm on.

91.     The first trucks deleted at Whiskey Dix Big Truck Repair, as discussed above, were done using Coleman's laptop.  Sinclair recalled seeing three done in one day.

92.     At the time Sinclair was working at the business, he did not believe that Whiskey Dix Big Truck Repair was doing deletes for fleets other than their own.  He noted that trucks belonging to Square One always seemed to be backed up and waiting in the yard for service.  There was no time to work on other fleets.  He did not know about whether Whiskey Dix Big Truck Repair might presently be deleting for trucks outside Square One's fleet.

93.     Sinclair stated that ninety-five percent of the semi-trucks in Square One's fleet were new enough to require DEF.  He stated that the drivers had credit cards under the name Fleet One.  He opined that if a truck newer than 2010 did not have DEF purchases, then it could be assumed the truck was deleted.  Sinclair showed SA Jamison an app on his phone which showed trucks in his fleet purchasing DEF and fuel.  He believed that Square One utilized this application as well.

94.     Sinclair recalled Carroll talking about receiving two million dollars in PPP loans and was waiting on another six hundred thousand. In speaking of how it was being spent, Carroll mentioned something to Sinclair about his lawyers sorting it out.  Sinclair opined that the money was used to open Square One and Whiskey Dix Big Truck Repair.

25

95.     Sinclair opined that Reed did not seem to want to be a part of the trucking business. Reed did not have an office at either location on Landon road and "acted like the building was on fire" when he was there.

96.     Sinclair gave Carroll his contact list of customers.  This was around 500 companies.  Sinclair thought that Square One trucks drove to all forty-eight mainland states.

97.     At Square One's office location was a list of all the trucks in the fleet.  This and other truck information had to be maintained for any DOT inspections.  Also, the truck information was needed so that proper parts and service could be performed, *e.g.*, need to know year of truck to ensure correct parts were purchased.

98.     Sinclair stated that Square One/Whiskey Dix Big Truck Repair used a Peterbuilt store in Sauget, IL to purchase parts.  They bought a lot of items and spent a lot of money at that store.  The person they dealt with was Mark (last name unknown), the parts manager.  Sinclair did not think anything nefarious was going on with Square One/Whiskey Dix's relationship with "Mark."  Sinclair opined that Mark made a lot of money from the companies' purchases.

### ADDITIONAL INVESTIGATIVE ACTIONS

99.     On December 7, 2021, I conducted research on the Facebook page for Whiskey Dix Big Truck Repair. While on this site, I noted the following:

   a.   Listed the business address as 380 Landon Road, Bourbon, MO 65441.

   b.   Listed website as: www.nobsfix.com. However, upon clicking on this website, it asks for login information including username and password, under the heading

26

login to the website. The same username and password request was observed when the website, www.whiskeydixbigtruckrepair.com, was entered.

    c.   Listed the number of the business as: 1-833-NO BS FIX.

    d.   Listed services as: diesel semi-truck and trailer repair and service. Battery, tires, parts, and towing.

    e.   Listed operating hours as: 8:00am till 5:00pm.

    f.   Last post was October 12, 2021 at 8:55am with the post: "Lets go Brandon!" along with a photograph of a motor and a semi-truck in the background.

100.    On December 3, 2021, I traveled to Whiskey Dix Big Truck Repair located at 380 Landon Road, Bourbon, MO.

101.    I left my vehicle and went inside the business.  I walked immediately into a large room containing couches and furniture.  Off to the west side of the room, I met with a woman who was working at an office and indicated I was looking for employment as a truck driver.  The woman provided me with an application for employment as a truck driver.  She stated that the offices for the trucking company were located across the street.  I did not identify myself as a federal investigator.  I thanked the woman and departed the business. I observed the woman using one computer, and also observed a man using a computer while sitting on a couch in the large entry room.

102.    I observed semi-trucks and trailers parked around the building.

103.    I departed the business and traveled across the street to the business offices of Square One Transport.

104.    At this location, I walked inside and noticed a few workstations and computers to at the north side of the building and workstations to the south of the building. I did not encounter anyone and so I walked to the south and spoke with a man sitting at a workstation area with about three to four computers.  I indicated that I wanted to see about employment with the company and was told by the man to enter an office to the west.  At this time I spoke with Bruce (no further information requested) and Melissa Ketcherside ("Ketcherside").  I was informed that the company was hiring drivers.  Ketcherside provided me with a business card bearing a link to fill out a job application.  This business card listed the address for Square One as 391 Landon Road, Bourbon, MO.  I did not identify myself as a federal investigator and advised that I was looking for employment for my brother-in-law.  I thanked Ketcherside and departed the business.

105.    On December 8, 2021, I spoke telephonically with Maggie Brown, a representative for the Crawford County, MO Assessor's Office.  At this time, I was provided parcel information for areas north of Highway 44 at Landon Road.

106.    I have reviewed this information which provided, in part, the following:

a. 380 Landon Road, Bourbon, MO is located on a 3.26 acre parcel bearing the Crawford County, MO Parcel Number: 026024000050010 and owned by Square One Bourbon, LLC, 1610 Des Peres Road, Ste. 150, St. Louis, MO 63131.

b. The building across the street, which is the offices of Square One Transport, and according to the aforementioned business card was 391 Landon Road, Bourbon, MO, was located on a 5.42 acre parcel bearing the Crawford County, MO Parcel

Number: 026024000049040 and owned by Square One Bourbon, LLC, 1610 Des Peres Road, Ste. 150, St. Louis, MO 63131.

c.   A building observed bearing a sign 'Whiskey Dix Parts Center,' the subject premises, was located on a 12.25 acre parcel bearing the Crawford County, MO Parcel Number:026024000050000 and owned by Square One Bourbon, LLC, 1610 Des Peres Road, Ste. 150, St. Louis, MO 63131.

## SUMMARY

107.    Based on the foregoing, I submit that there is probable cause to conclude that Square One and Whiskey Dix Big Truck Repair are involved in the tampering of monitoring devices, namely, the OBD, and in part by "deleting" vehicle emissions control parts required under the Clean Air Act.

108.    I know that it is usual and customary for businesses such as Square One and Whiskey Dix Big Truck Repair, and Whiskey Dix Parts Center (the subject premises) to keep and maintain records relating to services provided to their own fleet and to the fleet of other companies, clients and customers, banking and financials, and vehicle inspection and testing information on-site.

109.    In June of 2021, a Special Agent with the Federal Bureau of Investigation traveled to the site of the Whiskey Dix Parts Center where it was identified as having the address **86 Landon Road, Bourbon MO 65441 (Crawford County, MO Parcel Number: 026024000050000)**, the subject premises.   At that time, the Federal Bureau of Investigation Special Agent photographed the Whiskey Dix Parts Center.   I have reviewed these photographs, which showed multiple semi-trucks and trailers which are labeled as Square One vehicles, parked

29

at the site.  In one photograph, a semi-truck has a label on the hood reading '1012.'  As described in paragraph 36 of this affidavit, truck 1012 was identified by "Allen" as one of the semi-truck deleted at Whiskey Dix Big Truck Repair and belonging to Square One.

110.    On December 13, 2021, I traveled to the site of **86 Landon Road, Bourbon, MO 65441 (Crawford County, MO Parcel Number: 026024000050000)**, the subject premises, and observed semi-trucks parked on-site.

111.    Based on the foregoing information, I submit that there is probable cause to believe that on the subject premises, described as **86 Landon Road, Bourbon, MO 65441 (Crawford County, MO Parcel Number: 026024000050000)**, further described in ATTACHMENT A, are records, detailed in ATTACHMENT B, which are evidence of violations of 42 U.S.C. §§ 7413 (c)(2)(C) [falsification/tampering with/rendering inaccurate a monitoring device, required under the Clean Air Act] and Conspiracy to Defraud the United States, in violation of 18 U.S.C. § 371.

112.    EPA-CID will lead the execution of this search warrant. The law enforcement officers executing the search warrant are authorized to enlist the assistance of necessary personnel from the Federal Bureau of Investigation, Missouri Department of Natural Resources, U.S. Department of Transportation, EPA-CID's computer forensic laboratory, and other appropriate federal and state personnel in the execution of this search warrant.

113.    I therefore request a search warrant be issued for, and to seize from the aforementioned location, property constituting evidence of the commission of criminal offenses, and instrumentalities of these offenses.

**CONCLUSION**

30

114.    Based on the foregoing, I submit that this affidavit supports probable cause for a warrant to search the Subject Premises described in Attachment A and seize the items described in Attachment B.

115.    I further request that the Court order that all papers in support of this application, including the affidavit and warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Further, because this affidavit identifies witnesses by name, disclosure of this affidavit during the ongoing investigative phase of this case could compromise those witnesses. Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to destroy or tamper with evidence, including by contacting potential witnesses in this matter and attempting to influence the witnesses, to change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

I state under the penalty of perjury that the foregoing is true and correct.

Kenneth Jamison
Special Agent
United States Environmental Protection Agency

Sworn and subscribed to me via reliable electronic means pursuant to Fed. R. Crim. P. 41(d)(3) and Rule 4.1 this ___14___ day of December, 2021.

___/s/  David D. Noce___
HONORABLE DAVID D. NOCE
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF MISSOURI

31

**ATTACHMENT A**

PLACE TO BE SEARCHED

The subject premises (hereinafter, "premises") has the address 86 Landon Road, Bourbon, MO 65441 and having the Crawford County, MO Parcel Number: 026024000050000 and including the buildings, surrounding grounds/lot and any diesel engine vehicles located thereon.

The premises is more particularly described as a 12.25 acre site containing multiple large industrial buildings. One of the buildings, contained metal siding tan and red in color with a red metal roof and bears a large sign reading, 'Whiskey Dix Parts Center.' The right side of this building read, '86 Landon Road.' Other industrial buildings at the site also contained tan-colored siding and trimmed in red with red roofs.

Depicted below is the subject premises.







**ATTACHMENT B**

**ITEMS TO BE SEARCHED AND SEIZED**

All records and information relating to violations of Title 42, United States Code, § 7413 and Title 18, United States Code, § 371, that constitutes fruits, evidence and instrumentalities of those violations occurring after May 15, 2020, including:

1.      All "delete devices" (and those devices known by any other name, including "DPF defeats," "delete devices," "tuners," "performance tuners," "conversion kits" and "programmers").

2.      Any engine diesel particulate filters or selective catalytic reductions that have been "hollowed out" or tampered with, and any other hardware that demonstrates physical tampering with a vehicle's emission control system, including straight pipes and block plates.

3.      Hardware, software and other physical items used to affect an emissions deletion and/or to program, reprogram, or alter an engine's computer, including: exhaust manifolds, turbochargers, block plates, deletion kits, handheld tools (*e.g.* Tuner or laptop) used to access an engine's computer (ECM, ECU, OBD, etc.) software manuals, ECMs, ECUs, computers, wiring harnesses, and electronic and other associated equipment used for programming, reprogramming, or otherwise altering the ECM/OBD.

4.      Authorized personnel may capture photographic and video images of all materials, structures, buildings, offices, equipment, and any activity associated with this search warrant.

5.      Authorized personnel may conduct inspections and capture electronic, photographic, and video images of any vehicle or engine, especially heavy-duty diesel trucks/diesel-semi trucks. Inspections may include physical inspections of the engine compartment and emissions control hardware as well as inspections of engine computer systems (ECM and OBD) which may include access and downloading of data through the vehicle data link connector.

SPECIAL CONDITIONS PERTINENT TO SEARCHES

The search team is authorized to exclude from the search site and from any part of the surrounding vicinity designated by the search team as potentially unsafe, all persons who are not authorized to assist in the search.  Search team members may bar all public access during the execution of the search warrant if the presence of such persons will interfere with the efficient or safe performance of the activities authorized by the warrant.